# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **PSI DISTRIBUTION INCORPORATED** § | |
| **AND PRODRIL SERVICES** § | |
| **INTERNATIONAL LIMITED** § | |
| § | |
| **APPELLANTS** § **CIVIL ACTION NO. CA-H-09-CV-2366** | |
| § | |
| **PARTICLE DRILLING TECHNOLOGIES** § | |
| **INC., A NEVADA CORPORATION, et al** § | |
| | |
| **APPELLEE** | |

## BRIEF OF APPELLANTS,
## PSI DISTRIBUTION INCORPORATED AND
## PRODRIL SERVICES INTERNATIONAL LIMITED

## TABLE OF CONTENTS

PAGE NO.

1. TABLE OF AUTHORITIES............................................................ iii

2. STATEMENT OF THE NATURE AND STAGE
   OF THE PROCEEDING.............................................................  1

   A. Nature of the Case...............................................................  1

   B. Course of Proceedings and Disposition in the Court Below ....................... 3

3. STATEMENT OF THE ISSUES AND STANDARDS OF REVIEW................ 4

4. SUMMARY OF THE ARGUMENT...................................................... 7

5. ARGUMENT

   A. The Bankruptcy Court erred in Failing to Find that the Agreements
   Between Appellants and Appellee are Executory Contracts that Must
   Be Assumed or Rejected, and, if Rejected, that the Proper Remedy for
   The Breach of the Executory Contracts is a Recision of the Agreements............. 7

   B. The Bankruptcy Court erred by Granting the DIP Lender a Super
   Priority Lien with Priority Over the Appellants' Royalty Rights..................... 14

   C. The Bankruptcy Court erred by Finding that the Debtor Could Sell
   The Patents Free and Clear of the Appellants' Royalty Rights........................ 15

   D. The Bankruptcy Court erred by not Finding that Equity Demands that
   The Appellees not be Allowed to Break the Covenant not to Assign the
   Patents to a Third Party Without Such Third Party Agreeing to Assume
   The Royalty Obligations............................................................ 21

6. CONCLUSION............................................................................ 22

7. CERTIFICATE OF SERVICE........................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**AUTHORITY**                                                                    **Page No.**

<u>*Cases*</u>

*Accord Ruby v. Ebsary Gypsum Co.,*
   36 F. 2d 244 (W. D. N. Y. 1929)…………………………………………………. 5, 14

*In Re: Allison,* 960 F.2d 481 (5th Cir. 1992)………………………………………. 5

*In re: American Magnesium Co.,* 488 F. 2d 147 (5th Cir. 1974)……………………. 9

*In Re: Amica, Inc.,* 135 B. R. 534 (N.D. Ill. 1992)…………………………………. 9, 12

*Baylor University Medical Center v. Epoch Group, L.C.,*
   340 F. Supp.2d 749 (N.D. Texas 2004)………………………………..…………… 8

*Callanan v. Powers,* 199 N. Y. 268, 92 N. E. 747 (1910)…………………………. 13

*City of Dallas v. Wright,* 120 Tex. 190,
   36 S.W.2d 973 (Tx.Sup.Ct. 1931)……………………………………………… 13

*In Re Dartmouth Audio, Inc.,* 42 B.R. 871, 875 (1984)……………………………... 17

*De Mille Co. v. Casey,* 189 N.Y.S. 275, 280 (N.Y. Sup. Ct. 1921)…………………. 13

*Fenix Cattle Co. v. Silver (In re Select-A-Seat Corp.),*
   625 F.2d 290 (9th Cir. 1980)……………………………………………………….. 11

*Hausler v. Harding-Gill Co.(Comm.App. 1929)* 15 S.W.2d 548,
   *O*pinion approved; 13 Tex.Jur.2d "Contracts", par. 333, pp. 602, 603…………… 14

*Humphrey v. Camelot Retirement Community,*
   893 S.W.2d 55, 59 (Tex. App. 1994)……………………………………………… 13

*IFC Credit Corp. v. Burton Industries Inc.,*
   536 F. 2d 610, 614-615 (7th Cir.2008)……………………………………………… 8

*Igen Int'l, Inc. v. Roche Diagnostics GMBH,*
   335 F.3d 303 (4th Cir. 2003)……………………………………………………... 13

*Jones v Cooper,* 938 S.W. 2d 118 (Tex. App. 1996)………………..…17, 18, 19, 20, 21

*Kenyon v. Automatic Instrument Co.,* 160 F.2d 878 (6th Cir. 1947)…………. 19, 20, 21

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,*
756 F.2d 1043 (4th Cir. 1985)…………………………………………………… 11, 12

*New Shows, S.A. de C.V. v. Don King Productions, Inc.,*
2000 WL 354214 (2d Cir. 2000)…………………………………………………… 13

*O'Herron v. Southern Tier Stores, Inc.,*
9 A. D. 2d 568, 189 N. Y. S. 2d 323 (1959)……………………………………… 13

*Oscar Barnett Foundry Co. v. Crowe*, 219 F. 450 (3rd Cir. 1915)……………………. 14

*Robertson v. Dennis*, 330 F.3rd 696 (5th Cir. 2003)………………………….... 4, 5, 6

*In re Select-A-Seat Corp.*, 625 F.2d 290 (9th Cir. 1980)………………………….... 12

*Sperber v. Lawrence Freundlich Publ'rs,*
14 Med. L. Rptr. 1798, 1799 (N.Y. Sup. Ct. 1987)……………………………….. 13

*Standard Oil v Markum,* 64 F.Supp 656, (S.D. N.Y. 1945)……………………………. 16

*In Re: Tidy House Products Co.,* 79 F.Supp 674 (S.D. Iowa 1948)……………. 13, 16, 17

*Universal Sesmic Assoc., Inc. v. Harris Co.,*
228 F.3rd 205 (5th Cir. 2002)……………………………………………………… 4, 5, 6

*In re Waterson, Berlin & Snyder Co*. 48 F.2d 704 (2nd Cir.1931)……………………… 16

## *Other Authorities*

*11 U.S.C. Section 365(g)*………………………………………………………….. 12

*28 U.S.C. 158(C)(2)*………………………………………………………………. 4

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

### A. Nature of the Case

**The Technology.** Originally developed and patented by an engineer named Harry B. (Hal) Curlett (Curlett), CCore Licensing and Technology Limited (Ccore), PSI, PSIL, and Curlett Family Limited Partnership (CFLP), the Particle Impact Drilling Technology and associated patents (collectively "PID") has the demonstrated ability to allow oil companies to drill oil wells in a fraction of the time currently spent to drill. Since most costs on a well are "time related" costs, the technology can potentially save oil companies literally millions of dollars on a single well. Speed in drilling has long been viewed as the "holy grail" in the oil and gas industry. The concept of charging oil companies for the use of this patented technology, based on a percentage of the savings generated, results in astonishing projected revenue streams post commercialization. During the laboratory and field tests of this technology the publicly traded shares of the Debtor have traded as high as Seven Dollars per share for a market capitalization of over Two Hundred Million Dollars ($200,000,000.00) (which is after deducting the value of royalty payments to PSI, PSIL, and others). Even in the fall of 2008, during troubled times in the financial markets, the shares sold publicly for Three Dollars per share for a market capitalization of in excess of One Hundred Million Dollars ($100,000,000.00).

All would agree that right now, today, the technology is closer to being perfected and thus more valuable than at any time in the past. In fact, just a few months ago, Debtor was prepared to demonstrate the technology in a field test under a joint venture agreement with Shell Oil Company, one of the world's largest oil companies, and was literally hours away from the start of the field test when unrelated well complications caused the test to be postponed. Debtor has stated that the proposed buyer of the patents intends to continue its joint venture relationship

with Shell Oil Company and drill the field test well that has been scheduled for *this month,* August 2009.

**The Transaction.** PSI and PSIL invested approximately Twenty Million Dollars ($20,000,000.00) over 12 years in the development, lab testing, and field-testing of the patented technology. The patents were assigned to the Debtor in January 2004. The primary transaction documents were two Acquisition Agreements (one for PSI and one for PSIL), two Royalty Agreements (one for PSI and one for PSIL),and an Assumption and Assignment Agreement (all Parties). In addition, Particle executed an Exclusive License Agreement whereby Particle granted back to CFLP an exclusive worldwide license to the technology in every field of use except oil and gas. By the terms of the Royalty Agreements, as consideration for the assignment of the patents, Debtor granted back to these entities royalty rights and interests in these patents. These are extremely significant Royalty Rights.

*The Royalty Agreements state on their face that Debtor/Appellee "may only assign the patents (as defined in Acquisition Agreement) if the assignee agrees to be bound by the terms of this agreement."* (emphasis added)

One might wonder why Appellants would enter into such a transaction. Particle committed, as part of the transaction, to take their company public and raise the necessary R&D funds from public offerings to make sure the technology was perfected and commercialized. In addition, Appellants believed the Particle insiders had the industry connections that were necessary for the technology to reach its full potential. It is important to understand that these royalty rights amount to 4% of the Debtor's GROSS REVENUE generated from the technology plus 20% of the NET INCOME generated from the technology. Under very conservative assumptions (Particle can average a 10% profit margin after commercialization), for every $10 of

- 2 -

net profit earned by Debtor, $6 of the profit would go to Appellants and $4 of the profit would go to Debtor. If their profit margin is closer to the industry averages of 3% to 5% then the amount per $10 of net profit going to the Appellants would be even greater. The Net Revenue Royalty continues until Appellants have received seventy five million dollars ($75,000,000.00). The Gross Revenue Royalty continues for the life of the last patent which should even be more valuable than the Net Revenue Royalty.

### B. Course of Proceedings and Disposition in the Court Below

In December 2008, Appellee entered into a joint development agreement with Shell Oil Company to field test the technology. The agreement is listed as an Executory Contract on Debtor's schedules. Debtor's Disclosure Statement reveals that the Shell Agreement is still active. On March 3, 2009, the Debtor borrowed $475,000 from LC Capital Master Fund (LCC) to fund the venture with Shell. The first test well was scheduled for April 2009. Due to well problems unrelated to this technology Shell postponed the first scheduled test well until August 2009.

On May 23, 2009, additional $60,000 of notes were issued with LLC acting as agent for Don Sanders and Edward Heil. The notes were secured by substantially all assets of the Debtor. On May 24, 2009, the next day, the lender refused to continue to advance funds. On May 30, 2009 Debtor filed its Chapter 11 Petition.

On June 5, Debtor obtained an Interim Order approving Debtor Financing by Edward Heil in the amount of $1,575,000 giving him a priority lien on all assets of the Debtor including the patents. According to Debtor's pleadings, $475,000 of the DIP loan was to pay off LCC, $100,000 was for attorney's fees, and $1,000,000 was for operating funds until the company was sold back to himself, the friendly stalking horse bidder at the auction.

On June 7th Debtor filed its motion to sell all assets including the patents free and clear of all liens and interests including the Royalty Rights of the Appellants by auction with Heil being the stalking horse bidder at the amount of the DIP loan plus $200,000. The Debtor at that time sought to have the auction set for July 27th less than 60 days from the filing of the petition.

The Appellants objected to the DIP financing giving the lender liens superior to its royalty rights, objected to the sale of the patents free and clear of the interests of the Appellant Royalty holders, and objected to the terms, the process and the procedure of the auction.

The Bankruptcy Court found as follows:

1.     That the Royalty Agreements, Acquisition Agreements, and Assumption and Assignment Agreements are not executory contracts and therefore do not have to be assumed or rejected by the Debtor. Appellants' remedy is a claim for damages for breach of said contracts.

2.     The Debtor can sell the Patents free and clear of Appellants' Royalty Rights. Again, Appellants' remedy is a claim for damages for breach of contract.

3.     The DIP lender was granted a super priority lien on all assets of the Debtor including the Patents, which lien has priority over Appellants' Royalty Rights.

**STATEMENT OF THE ISSUES
AND STANDARDS OF REVIEW**

A District Court reviews a Bankruptcy Court's decision under the same standard of review that a Court of Appeals applies to a District Court judgment. (28 U.S.C. § 158 (c)(2) This Court reviews "the Bankruptcy Court's finding of fact for clear error and it's legal conclusions and mixed questions of law and fact under a de novo standard of review" *Universal Sesmic Assoc. Inc., v Harris County,* 228 F.3d 205, 207 (5th Cir. 2002), *Robertson v Dennis,* 330 F.3d 696, 701 (5th Cir. 2003) A finding is clearly erroneous and reversible if, based on the entire

evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *In Re Allison,* 960 F.2d 481, 483 (5th Cir. 1992).

1.      Whether the Bankruptcy Court erred in failing to find that the agreements between the Appellants and Appellee are Executory Contracts that must be assumed or rejected, and, if rejected, that the proper remedy for the breach of the executory contracts is a recision of the Agreements.

The standard of review for "the Bankruptcy Court's finding of fact  for clear error and it's legal conclusions and mixed questions of law and fact under a de novo standard of review" *Universal Sesmic Assoc. Inc., v Harris County,* 228 F.3d 205, 207 (5th Cir. 2002), *Robertson v Dennis,* 330 F.3d 696, 701 (5th Cir. 2003)

2.      Whether the Bankruptcy Court erred by granting the DIP lender a super priority lien with priority over the Appellants' Royalty Rights.

The standard of review for "the Bankruptcy Court's finding of fact for clear error and it's legal conclusions and mixed questions of law and fact under a de novo standard of review" *Universal Sesmic Assoc. Inc., v Harris County,* 228 F.3d 205, 207 (5th Cir. 2002), *Robertson v Dennis,* 330 F.3d 696, 701 (5th Cir. 2003)

3.      Whether the Bankruptcy Court erred by finding that the Debtor could sell the patents free and clear of the Appellants' Royalty Rights.

The standard of review for "the Bankruptcy Court's finding of fact for clear error and it's legal conclusions and mixed questions of law and fact under a de novo standard of review" *Universal Sesmic Assoc. Inc., v Harris County,* 228 F.3d 205, 207 (5th Cir. 2002), *Robertson v Dennis,* 330 F.3d 696, 701 (5th Cir. 2003)

4.        Whether the Bankruptcy Court erred by not finding that equity demands that the Appellee not be allowed to break the covenant not to assign the patents to a third party without such third party agreeing to assume the royalty obligations.

The standard of review for "the Bankruptcy Court's finding of fact for clear error and it's legal conclusions and mixed questions of law and fact under a de novo standard of review" *Universal Sesmic Assoc. Inc., v Harris County,* 228 F.3d 205, 207 (5th Cir. 2002), *Robertson v Dennis,* 330 F.3d 696, 701 (5th Cir. 2003)

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court erred in finding no Executory Contracts existed between the parties. The parties' contract is evidenced through six documents executed by the Appellants and Appellee at the time of the transaction. These documents set forth numerous obligations which were to be undertaken by each party. While the transaction included the assignment of patents and the duty to make royalty payments, these two items represented only a portion of the parties' duties and obligations. There were many continuing obligations but by far the most important one was that the Debtor/ Appellee was prohibited from assigning the Patents to a third party unless that party agreed to assume the Royalty Agreements.

The Bankruptcy Court further erred by failing to recognize Appellants' equitable interest in the patents. The contract between the parties clearly demonstrates both parties' intentions for the royalty rights to form a portion of indivisible property, so much so that any assignment of the patent was made conditional on the assignee's acceptance of the obligation to pay royalties.

## ARGUMENT

**A        The Bankruptcy Court erred in failing to find that the agreements between Appellants and Appellee are Executory Contracts that must be assumed or rejected, and, if rejected, that the proper remedy for the breach of the Executory Contracts is a recision of the Agreements.**

The Bankruptcy Court in its Memorandum Opinion found that these contracts were not executory because the only significant obligations left under the contracts were the payment of royalties. The Court erred in applying the facts to the well settled law. There are six documents that are the core of this dispute. All documents were executed as part of the assignment of the technology from the Appellants and related parties to the Appellee/ Debtor. The documents are:

- 7 -

1. Acquisition Agreement PSI Distribution Incorporated

2. Acquisition Agreement ProDril Services International Limited

3. Assignment and Assumption Agreement

4. Royalty Agreement PSI

5. Royalty Agreement PSIL

6. Exclusive License Agreement CFLP (the Debtor conceded that any sale would be subject to this License)

"It is well established law (in Texas) that instruments pertaining to the same transaction may be read together to ascertain the parties intent. This is true even if the parties executed the instruments at different times and the instruments do not expressly refer to each other and even if the instruments are not between the same parties. Thus the court may determine as a matter of law that multiple documents comprise a written contract and in appropriate instances construe all the documents as if they were part of a single unified instrument." *Baylor University Medical Center v. Epoch Group, L.C.,* 340 F. Supp.2d 749, (N.D. Texas 2004).

The Seventh Circuit said the court must consider the long-standing contract principle that when different instruments are executed together as part of one transaction or agreement, they are to be read together and construed as constituting but a single instrument. *IFC Credit Corp. v. Burton Industries Inc.*, 536 F. 2d 610, 614-615 (7th Cir.2008)

These six documents were all executed as part of the transfer of the technology to the Debtor, at the same time, in the same transaction and together should be considered a single unified instrument.

The Fifth Circuit has said that, "Both the rule in Texas and in the majority of other jurisdictions is that a contract is executory when something remains to be done by one or more of

- 8 -

the parties. An executory contract is one in which a party binds himself to do or not to do a particular thing, whereas an executed contract is one in which the object of the agreement is already performed. *In re: American Magnesium Co.,* 488 F. 2d 147 (5th Cir. 1974)

It is hard to understand how the Court held that no meaningful performance remains on either side of the contract except the payment of royalties and thus there is no executory contract. The Debtor and PSI, PSIL, CCore, and CFLP each share continuing obligations under the agreements. The Debtor is obligated to pay royalties to three parties on both gross and net proceeds and account quarterly for those payments and provide financial statements and allow audits.  They have paid no royalties to this point. PSI, PSIL, Ccore, and CFLP have continuing obligations to assist in refining the patent technology and also to assist debtor in product upgrades.

### Paragraphs 3 & 4 of the Assignment Assumption Agreement state:

**3.** CFLP, PSI, PSIL, CCORE, and CURLETT hereby further agree that they will (i) communicate to said PARTICLE DRILLING, or to its successors, assigns, and legal representatives, any facts known to that person respecting the CFLP Inventions, CFLP Patents/Applications and CFLP Know-How, and at the expense of PARTICLE DRILLING, testify in any legal proceedings, sign all lawful papers, execute all divisional, continuation, reissue and substitute applications, make all lawful oaths, and generally do everything possible to aid PARTICLE DRILLING, its successors, assigns and nominees to obtain and enforce proper patent protection in all countries, (ii) promptly disclose to PARTICLE DRILLING any development or modifications made or acquired by the Party that are improvements of the CFLP Inventions, whether or not patentable or unpatentable and whether developed solely or jointly with others, and (iii) and does hereby assign to PARTICLE DRILLING his or its entire right, title, and interest in any such improvements including the right to file patent applications therefore and have letters patent issued in its own name in all countries. (emphasis added)

**4.** CFLP, PSI, PSIL, CCORE, and Curlett agree that they will communicate to PRODRIL ACQUISITION COMPANY, (Particle Drilling) or to its successors, assigns and legal representatives, any facts

known to it respecting any such improvements to the CFLP Inventions, and at the expense of PARTICLE DRILLING, testify in any legal proceedings, sign all lawful papers, execute all divisional, continuation, reissue or substitute applications, make all lawful oaths, and generally do everything possible to effectuate the intent of this Agreement and to aid PARTICLE DRILLING, its successors, assigns and nominees to obtain and enforce proper patent protection in all countries

**Paragraphs 3.6 and 5.3 of The Exclusive Licensing Agreement provide for reciprocal, ongoing obligations between the parties as follows:**

3.6
CFLP shall, during the term of the license granted under this Agreement, provide adequate and sufficient technical support using skilled and qualified personnel knowledgeable of the Inventions and the Particle Impact Drilling Process and System to PRODRIL ACQUISITION COMPANY (Particle Drilling) in support of the development of CFLP's applications of the Licensed Products whenever reasonably requested by PRODRIL ACQUISITION COMPANY (Particle Drilling)

5.3
CFLP and PRODRIL ACQUISTION COMPANY (Particle Drilling)acknowledge that this Agreement and the licenses set forth in Sections 5.1 and 5.2 above as well as the license granted under Section 2.1 of this Agreement constitute an executory agreement as provided in 11 U.S.C. Section 365(n) (the 'Federal Bankruptcy Code"). The parties hereto each acknowledge that if it, as a debtor in possession or a trustee in bankruptcy in a case under the Federal Bankruptcy Code, rejects the licenses granted to the other party under this Agreement, the other party may elect to retain its rights therein and upon written request of the other party, it will not interfere with the right of the other party as provided in this Agreement.

**The Royalty Agreements** require the Debtor to account to Appellants on a quarterly basis and provide Appellants with its quarterly and year to date income statements and balance sheets, and a written report that sets forth the computation of its earnings for that quarter certified by the CFO of Debtor. Appellants covenant to keep such reports confidential.

**The Royalty Agreements** permit Appellants on an annual basis to inspect and audit the books of Debtor which relate to the determination of its earnings.

**In the Royalty Agreements** Appellants covenant that they will only assign their royalty rights in connection with a dissolution expressly permitted under the Acquisition Agreements.

**In The Royalty Agreements** Debtor covenants to Appellants that during any period that (i.) its parent company directly or indirectly through one or more affiliates owns or controls more than 50% of its stock and (ii) there are not at least five Independent Shareholders, Debtor has the duty to Appellants not to pay any of its officers compensation in an amount which breaches the fiduciary duty owed to unaffiliated shareholders under Texas corporate law.

**The Acquisition Agreements** (Section 6.5(b)) require the parties to cooperate in the event of any claim, action, suit, or investigation or other proceeding.

Most importantly, and the continuing obligation that debtor now intends to breach, **The Royalty Agreements** state that *Debtor may only assign the Patents (as defined in the Acquisition Agreement) if the assignee agrees to be bound by the terms of the Royalty Agreement.* (emphasis added)

The Ninth Circuit held, specific material performance obligations, such as a continuing obligation to account for and pay royalties, duties of notice, responsibilities relating to reporting, labeling, policing, service, and maintenance, refraining from licensing to others, and obligations to provide product upgrades, potentially bring one or the other of the parties' activities within the domain of executory contracts. *Fenix Cattle Co. v. Silver (In re Select-A-Seat Corp.), 625 F.2d 290, 292 (9th Cir. 1980).*

Whether a contract is executory will depend on the terms of the particular contract and the degree to which the parties performed their respective duties as of the bankruptcy petition date. Affirmative covenants will generally render a contract executory. *See, e.g., Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir. 1985) (technology

licensor's duty to defend intellectual property rights, indemnify licensee and maintain confidentiality). Likewise, negative covenants have been determined to be sufficient to make a contract executory. *See, e.g., In re Select-A-Seat Corp.*, 625 F.2d 290 (9th Cir. 1980) (exclusive licensor's duty not to further license held sufficient).

The Bankruptcy Court in its memorandum opinion cited the case of *Lubrizol Enters., Inc v. Richmond Metal Finishers, Inc.*, 756 F2d 1043, 1046 (4th Cir. 1985). The statement of that Court; "It is true that a contract is not executory as to a party simply because the party is obligated to make payments of money to the other party." However, the Court went on in the next sentence to say, "Therefore, if Lubrizol had owed RMF nothing more than a duty to make fixed payments or cancel specified indebtedness under the agreement, the agreement would not be executory as to Lubrizol. However, the promise to account for and pay royalties required that Lubrizol deliver written quarterly sales reports and keep books of account subject to inspection by an independent Certified Public Accountant. *This promise goes beyond debt, or promise to pay money, and was at the critical time executory*.(my emphasis)

Persuant to Title 11 United States Code Section 365(g), the rejection of an executory contract by the debtor constitutes a breach of such contract immediately before the date of the filing of the petition. The Court in *In Re: Amica, Inc.*, 135 B. R. 534 (N.D. Ill 1992) held that the remedy for the rejection of a contract under Section 365 is governed by state contract law. (*Id.* at 562). Under the terms of The Acquisition Agreements in our case, it was agreed that Texas law would apply to contract issues.

This is an executory contract, and the debtor, therefore, has two options: 1. Assumption or Assumption and Assignment of the contractual obligations; or 2. Rejection of the contract. If the Debtor rejects the executory contract the remedy is a rescission of the contract. As the Court

said in *In Re: Tidy House Products Co.,* 79 F.Supp 674 (S.D. Iowa 1948) if the contract is rejected, there is an abandonment of the entire contract and the bankrupt estate can have no benefits therefrom. "When a trustee abandons an asset, it is to be treated as if the bankrupt never had title to it, so that the title stands as if no assignment had been made." (*Id. at 677*)

Texas case law indicates that a party can seek the aid of a court in order to obtain cancellation or rescission of an assignment, thus obtaining reassignment of title. *See, e.g., Humphrey v. Camelot Retirement Community,* 893 S.W.2d 55, 59 (Tex. App. 1994) (stating that a trial court may grant rescission, and that the decision to grant rescission lies within its sound discretion). It has been settled by our courts that cancellation is an equitable remedy. *City of Dallas v. Wright,* 120 Tex. 190, 36 S.W.2d 973. The Second Circuit in *New Shows, S.A. de C.V. v. Don King Productions, Inc.*, 2000 WL 354214 (2d Cir. 2000) held that where damages appear adequate rescission is inappropriate. In the converse, where damages are inadequate, rescission is an option. (*Id.*) The Debtor clearly is unable to provide adequate damages to the Appellants. Rescission is permitted when the complaining party has suffered breaches of so material and substantial a nature that they affect the very essence of the contract and serve to defeat the object of the parties. *Callanan v. Powers,* 199 N. Y. 268, 92 N. E. 747 (1910); *O'Herron v. Southern Tier Stores, Inc.*, 9 A. D. 2d 568, 189 N. Y. S. 2d 323, 324 (1959).

The "failure to pay royalties constituted a material breach of license agreement where royalty payments were the chief benefit for which licensor bargained." *Igen Int'l, Inc. v. Roche Diagnostics GMBH,* 335 F.3d 303 (4th Cir. 2003) Moreover, Courts have granted rescission to plaintiff when no royalties had been paid because the court felt the absence of payment defeated an essential objective of the publishing contract. *De Mille Co. v. Casey,* 189 N.Y.S. 275, 280 (N.Y. Sup. Ct. 1921) *Sperber v. Lawrence Freundlich Publ'rs,* 14 Med. L. Rptr. 1798, 1799

(N.Y. Sup. Ct. 1987) (granting a motion for partial summary judgment to the author, who sought rescission of the publishing contract because at least two-thirds of the royalties were not paid). Rescission was also granted in *Oscar Barnett Foundry Co. v. Crowe*, 219 F. 450 (3rd Cir. 1915) upon a finding that all royalty payments had ceased and that the patent was no longer being exploited. *Accord Ruby v. Ebsary Gypsum Co.*, 36 F. 2d 244 (W. D. N. Y. 1929).

"If an executory contract is breached in a material respect, as where one party fails or refuses to perform, the other party is ordinarily entitled to rescind the agreement, except of course where such relief would be inequitable; and where breach of contract is deemed to be a sufficient ground for rescission, a total breach is not required, but on the contrary a partial breach will be sufficient if it affects a material part of the agreement, or if it clearly evidences an intention by the party in default to abandon the agreement." *Hausler v. Harding-Gill Co., 15 S.W.2d 548* (Comm.App. 1959)

Debtor's failure to pay royalties is a breach and it definitely is material. Moreover, if the Debtor is permitted to sell free and clear under Section 363(f), this would in itself constitute a material breach.  Royalty payments were the chief benefit for which Appellants and the related entities bargained in this transaction.

**B.    The Bankruptcy Court erred by granting the DIP lender a super priority lien with priority over the Appellants' Royalty Rights.**

Appellants contend that it was error for the Court to grant the DIP lender a lien with priority over the Appellants Royalty Rights due to the fact that the Contracts are Executory contracts that must be either assumed or rejected as argued above and are not subject to any lien of the Debtor. Furthermore, Appellants contend that it was error for the Court to grant the DIP lender a lien with priority over the Appellants Royalty Rights due to the fact that the Royalty

Rights are not a "debt" or a "claim" but an acquired right as argued below and therefore are not subject to any lien created by the Debtor.

**C.    The Bankruptcy Court erred by finding that the Debtor could sell the patents free and clear of the Appellants' Royalty Rights.**

The Royalty Rights are *not* a debt.  Secured or unsecured; they are an acquired right.  It is first significant to look at the Acquisition Agreement entered into between the Debtor and the Objectors on January 20, 2004 wherein these rights were transferred. Section 3.18 of the Acquisition Agreement states:

> "*The rights under the Royalty Agreement to be acquired by PSI* ( emphasis added) pursuant to the terms hereof (the "Rights") *are being or will be acquired by PSI for its own account* (emphasis added) and with no intention of distributing or reselling the Rights or any part thereof in any transaction that would be in violation of the securities laws of the United States of America, or any state, without prejudice, however, to the Rights of PSI at all times *to sell or otherwise dispose of all or any part of the Rights under an effective registration statement under the Securities Act,* (emphasis added) or under an exemption from such registration available under the Securities Act. ……*PSI understands that the Rights will not be registered at the time of their issuance under the Securities Act for the reason that the sale provided for in this Agreement is exempt pursuant to Section 42 of the Securities Act…."*(emphasis added).

At the time of the transaction, all parties understood the nature of these Royalty Rights. These were acquired rights. They were not just a debt like the water bill or the rent which has been the Debtor's position. So much a part of the Patents were the Royalty Rights assigned that the Debtor stated that the only reason these Rights were not registered as securities with the Securities Exchange Commission under an effective registration statement was that the transaction was exempt under Section 42.  In addition, the Royalty Agreements state on their face that Debtor *"may only assign the patents (as defined in Acquisition Agreement) if the assignee agrees to be bound by the terms of this agreement."* (emphasis added).

The Court in *Standard Oil v Markum,* 64 F.Supp 656, (S.D. N.Y. 1945), addressed a situation where the government had seized certain patents under the *Trading With The Enemy Act* which had licenses and royalty rights tied to it. The Court said, "The scope of those interests is measured by the Four-Party Agreement, and includes licensing rights, royalty rights and other rights. Those interests were not mere contractual rights. They are property rights of the type that are protected against the holder of the legal title to the patents, or against third parties with notice or against the holder's trustee in bankruptcy.  They fall within that classification of property rights sometimes denominated 'equitable servitudes'."(*Id. a*t 670)

*In re Waterson, Berlin & Snyder Co*. 48 F.2d 704 (2nd Cir.1931) a music publisher filed for bankruptcy and had among its assets musical compositions which it had purchased and which it had contracted to pay a percentage of its profits as royalties to the composers. The Trustee invited buyers to bid on the assets free from all royalty claims. These were future royalty claims on future profits. The court noted that it would seem unreasonable to suppose that the trustee could sell them free from all rights of the composers and thus deprive the composer of the only means of fixing the royalties, which they have been promised. In the court's opinion, while the rights may be sold by the trustee, they must be sold subject to the right of the composers to have them applied on their behalf and to be paid royalties according to the terms of the contractual agreements. The Court rejected the argument of the Trustee that the agreement to pay royalties in exchange for the transfer of title is nothing more than a contract to pay, enforceable only at law, and the relation between the parties was nothing more than debtor/ creditor. (*Id.*)

Likewise in the case of *In Re: Tidy House Products Co.,* 79 F.Supp 674 (S.D. Iowa 1948) the Court addressed an agreement in which the inventor sold and assigned his intellectual properties to Tidy House by written contract and reserved a royalty as a percentage of net sales.

Tidy House filed for Bankruptcy. The Court stated, "Evidently to abrogate that part of the contract which provides for the payment of royalties the trustee applied for and was granted an order to sell all of the personal property of the bankrupt, including the good will and trademarks, with the provision that the sale should be made, not only fee and clear of all liens and encumbrances, but also without any provision for the payment of any royalty."(*Id.*)"It has not been pointed out to me wherein the trustee has the right to accept all of the provisions of a contract, including trademarks, and repudiate the consideration provided for in the contract."(*Id.*) The Court ended its opinion by stating, "I can find nothing in the fact that this is a proceeding in bankruptcy, or in any provisions of the Bankruptcy Act, which frustrates the right of these petitioners to insist that in the case of a sale or transfer of the right to use the trademarks that their royalty be preserved."(*Id.*).

The Bankruptcy Court below rested its finding on the fact that the above cases, which are directly on point, predated the 1952 Patent Act. The Court stated that the 1952 Patent Act provided that patents shall have the attributes of personal property and resolved some conflicting precedent where Courts had held that royalties were like real property "covenants running with the land". In an effort to distinguish the case relied on by Appellee, *Jones v Cooper,* 938 S.W. 2d 118 (Tex. App. 1996) and the cases above cited by Appellants, which are all good law, the Judge assumed that the 1952 Patent Act must have changed the law.

To the contrary, in 1984 the Court in *In Re Dartmouth Audio, Inc.,* 42 B.R. 871, 875 (1984) said "It has been specifically held that the trustee of a bankrupt cannot sell the assets of a debtor's business, including a right to use a trademark, free of the obligations to pay a royalty for the trademark use." (citing *In Re Tidy House*)

Being convinced that the 1952 Patent Act must have superseded the cases cited by the Appellant that were directly on point, the Bankruptcy Court then relied on *Jones v Cooper* to sustain the Appellees position that the Debtor can ignore the specific language of the Royalty Agreements that says that Debtor is not permitted to transfer the patents to any third party unless that party agrees to assume the liability of the royalties and that these royalty rights can be extinguished in a sale.

*Jones v. Cooper*, however, is clearly distinguishable.  Facts in the Jones case are as follows:

1. Jones worked for Cameron (later bought by Cooper). After Jones left Cameron he applied for and was awarded patents. Jones sold the patents to Koomey. Koomey agreed by contract to pay Jones as consideration therefore the greater of $50,000 per year or ½ of 1% of the annual gross revenues. The contract said that the agreement would be binding on Koomeys successors or assigns.

2. Cameron sued Jones and Koomey saying that Jones stole trade secrets from Cameron related to the patents and sold/ revealed them to Koomey.

3. Koomey borrowed money against the patents and when Koomey defaulted on the note, the lender foreclosed and took title to the patents and sold the patents to PD-BOP. PD-BOP intervened in the lawsuit.

4. Cooper then bought Cameron and settled the lawsuit with Koomey and PD-BOP. In the settlement Cooper received title to the patents and Koomey agreed to indemnify Cooper for any future claims brought by Jones.

5. Jones later sued Koomey and PD-BOP (not Cooper) for royalties owed and the case was settled for $100,000.  The settlement agreement released Cooper to the extent

that Koomey and the other Defendants might have joint and several liability with Cooper for a claim asserted by Jones.

6.    Jones then brought suit against Cooper.

7.    Jones claimed the promised payments under the Patent Rights Agreement were like property rights (mineral interest) that "run with the title" and that his rights to the royalty payments were part of the patent title.

8.    Cooper claimed he did not assume the contractual obligation to pay, that the statute of frauds barred the action, and that Jones had released his claim.

The Court agreed with Cooper that the contractual obligation to make these payments were Koomey's obligation and Cooper didn't agree to assume that contractual obligation. *The Court said that the money described as "royalties" in the Patent Rights Agreement was actually just the contractual consideration for the assignment.* The Court noted that "the assignment of the patents from PB-BOP to Cooper does not mention the PRA nor does the record reflect the terms of the assignment from First City to PB-BOP upon foreclosure." Under the facts of the case, the Court said that the obligation was an obligation of Koomey under the contract and under contract law that unless Cooper agreed to assume that obligation, such assumption could not be implied. The Court said that Jones did not lose his rights to the payments after the patents were assigned to Cooper because Koomey continued to be obligated under the contract.

It is interesting that the Court in Jones cited a case much more similar in facts to ours and then distinguished it. *Kenyon v. Automatic Instrument Co.,* 160 F.2d 878 (6th Cir. 1947). In *Kenyon,* the patentee assigned his patents to a Delaware corporation. In consideration for the assignment, the patentee was to receive $5.00 for each machine manufactured. (*Id.* at 881.) The corporation was later placed into receivership, and a related corporation purchased the patent

- 19 -

from the receiver. (*Id.* at 880). The court held that since the purchasing corporation knew of the contract, and because the patentee's contract rights would be destroyed if the contract did not transfer with the patent in the receivership sale, the purchasing corporation was liable for the royalties. (*Id.* at 884)

The *Jones* Court distinguished *Kenyon*. It said, *"Unlike the patentee in Kenyon, Jones' rights under the PRA were not destroyed by the transfer of the patents to Cooper. Koomey remained obligated to Jones thereunder. Since Jones did not lose his cause of action against Koomey for breach of the PRA when the patents were transferred to Cooper, the burdens under the PRA cannot be considered inextricably entwined with ownership of the patents so as to justify implying assumption on equitable grounds.* (emphasis added) *Jones v Cooper,* 938 S.W. 2d 118 (Tex. App. 1996)

To say this another way, If Jones had lost his cause of action against Koomey for breach of the PRA when the patents were transferred to Cooper, then the Court would have said that the burdens under the PRA (royalty payments) will be considered inextricably entwined with ownership of the patents so as to justify implying assumption on equitable grounds. There is quite a bit of difference in the facts before the Court and the facts in Jones. Our facts are much more kin to the Kenyon case or the three cases cited in this brief. Where Jones simply had an agreement to pay set forth in the contract, the ultimate owner of the patents was three owners removed from the agreement to pay, and the plaintiff, Jones, had a cause of action against the original obligor, in the case at bar we have:

     1.  Wording in the Acquisition Agreement which says:

> "*The rights under the Royalty Agreement to be acquired by PSI* (emphasis) pursuant to the terms hereof (the "Rights") *are being or will be acquired by PSI for its own account* (emphasis added) and with no intention of distributing or reselling the Rights or any part thereof in any

transaction that would be in violation of the securities laws of the United States of America, or any state, without prejudice, however, to the Rights of PSI at all times *to sell or otherwise dispose of all or any part of the Rights under an effective registration statement under the Securities Act,* (emphasis added) or under an exemption from such registration available under the Securities Act. ……PSI understands that the Rights will not be registered at the time of their issuance under the Securities Act for the reason that the sale provided for in this Agreement is exempt pursuant to Section 42 of the Securities Act…."

2. A separate Royalty Agreement that says:

   PDTI "*may only assign the patents (as defined in Acquisition Agreement) if the assignee agrees to be bound by the terms of this agreement.*"

3. An Assignment and Assumption Agreement that requires many covenants to continue to be performed between the parties.

4. The party seeking to avoid the payments is the party who agreed to them and the same party who covenanted not to assign the patents to a third party *unless the third party agreed to assume the royalty payments.*

5. There is no other party obligated.

Therefore the Jones case can be easily distinguished on its facts from the case at bar. The *Jones* case carefully defined the difference in the *Jones* facts and the *Kenyon* facts and let the specific facts of each case and the equities of each case govern the distinction. Had the 1952 Patent Act changed the law in *Kenyon*, (1947) which predated the 1952 Act, the Court would have said so. It would not have had to distinguish the Jones facts from the *Kenyon* facts.

**D.    The Bankruptcy Court erred by not finding that equity demands that the Appellee not be allowed to break the covenant not to assign the patents to a third party without such third party agreeing to assume the royalty obligations.**

To fully appreciate this case, it is essential to realize that this company *never made a dime*, nor did Appellants, during the 12 years they worked diligently to patent and develop the

technology before the sale to Appellee. The same routine has happened over and over again - sell stock to raise equity investment, use the funds for operational and development expenses until the funds run out, sell more stock to raise more equity. For 17 years this has been the norm as the entrepreneur fundamentals of risk and reward continued to drive investors to keep investing. The company has never accumulated assets to any degree. All equity raised has been spent to operate and develop. So great a prize is the potential of this technology that the largest oil companies in the world are still today willing to put their valuable wells on the line as test wells hoping the next one is the well where all the kinks are worked out and the technology is finally ready to be used on oil wells worldwide.

Five years ago Appellants assigned their patents, representing 12 years of invention and development and $20 million dollars of investment to the Debtor. Appellants took in return a Royalty Agreement and an Assignment and Assumption Agreement with some very hard, fast covenants that they relied on and trusted the Debtor to perform. The heart of invention, entrepreneurship, risk and reward has driven this industry changing technology development for 17 years. Now, less than 60 days from a test well with one of the largest oil companies in the world, the insiders are attempting to "wash" this technology clean of the rights of those who invented and developed and invested. It is wrong and equity should not allow it to happen.

**CONCLUSION**

For all the reasons set forth above, the Appellants respectfully request that this Court reverse the Order of the Bankruptcy Court and render a finding that the listed contracts are executory contracts, that Debtor has breached said contracts and the Appellants are entitled to a remedy of recission. Appellants respectfully request that this Court reverse the Order of the

Bankruptcy Court and render a finding that the lien of the DIP financing does not have priority over Appellant's royalty rights.

Alternatively, Appellants respectfully request that this Court reverse the Order of the Bankruptcy Court and render a finding that the said Patents may not be sold free and clear of the Appellant's royalty rights and that any purchaser of the Patents assumes the royalty obligation set fourth in the various listed contractual Agreements. Appellants request that this Court reverse the Order of the Bankruptcy Court and render a finding that equity demands that any sale or assignment of the Patent Rights be subject to the Royalty rights of the Appellants, as set fourth in the Royalty Agreement and the Assignment and Assumption Agreement.

Respectfully submitted,

PSI DISTRIBUTION INCORPORATED
AND PRODRIL SERVICES
INTERNATIONAL LIMITED,
APPELLANTS


BY:  /s/ Michael D. Greer
        F. G. JACK BOBO
        MICHAEL D. GREER


F. G. JACK BOBO, ESQ.
MISSISSIPPI BAR NO. 3603
P. O. BOX 427
LYON, MS 38645
(662) 624-2425  PHONE
(662) 624-2420  FAX

MICHAEL D. GREER, ESQ.
MISSISSIPPI BAR NO. 5002
P. O. BOX 907
TUPELO, MS 38802
(662) 842-5345  PHONE
(662) 842-6870  FAX

## CERTIFICATE OF SERVICE

We certify that on August 7, 2009, a true and correct copy of the foregoing was filed electronically in the United States District Court for the Southern District of Texas, Houston, as well as in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, with delivery to Honorable Keith Ellison and Honorable Marvin Isgur.  As such, this document was served on all counsel who have consented to electronic service.


/s/  Michael D. Greer
F. G. JACK BOBO
MICHAEL D. GREER